UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>      Plaintiff,<br><br>      v.<br><br>PATRICIA A. LEEDS,<br><br>      Defendant. | Case No. 1:22-cv-00379-AKB<br><br>**MEMORANDUM DECISION AND ORDER RE MOTION FOR SUMMARY JUDGMENT** |

Pending before the Court is Plaintiff United States of America's (Government) Motion for Summary Judgment against Defendant Patricia A. Leeds (Leeds) in her capacity as personal representative of the Estate of Richard Leeds (Estate). (Dkt. 24 at p. 1). Having reviewed the record and the parties' submissions, the Court finds that the facts and legal argument are adequately presented and that oral argument would not significantly aid its decision-making process, and it decides the motions on the parties' briefing. Dist. Idaho Loc. Civ. R. 7.1(d)(1)(B); *see also* Fed. R. Civ. P. 78(b) ("By rule or order, the court may provide for submitting and determining motions on briefs, without oral hearings.").

## INTRODUCTION

The Government seeks summary judgment against Patricia in her capacity as the personal representative of the Estate. (Dkt. 24 at p. 1). Specifically, the Government seeks a judgment for approximately $2,000,000 in penalties assessed by the Internal Revenue Service (IRS) against Richard Leeds (Richard), who is now deceased, for his willful failure to file Reports of Foreign Bank and Financial Accounts (FBARs). (*Compare* Dkt. 1 at p. 9 (requesting $2,279,974.19 as of August 15, 2022) *with* Dkt. 24-1 at p. 17 (requesting $1,941,585.22 as of March 1, 2024)). The

Government asserts that Richard willfully failed to file FBARS for the tax years 2006 through 2012 and that it is entitled to the maximum penalties under 31 U.S.C. § 5321(a)(5)(C)(i). Patricia responds that the assessed FBAR penalties extinguished when Richard died; whether Richard's conduct was willful presents a triable factual issue; and the penalties violate the Eighth Amendment's Excessive Fines Clause because they are grossly disproportional to both Richard's and Patricia's culpability.

The Court concludes that the FBAR penalties survived Richard's death; there is no genuine issue of material fact that Richard's failure to file the FBARs was willful; and the Excessive Fines Clause applies to willful FBAR penalties. The Court further concludes there are no genuine issues of material fact regarding whether the penalties are grossly disproportional. As to Richard, the penalties are not grossly disproportional but—to the extent the Government seeks to recover the penalties against Patricia personally or any property in which she has an ownership interest—the penalties are grossly disproportional to the gravity of her offense. Accordingly, for the reasons set forth below, the Court grants the Government's summary judgment motion against the Estate but denies the motion to the extent it seeks a judgment against Patricia personally.

## FACTUAL BACKGROUND

The Court finds the following undisputed facts:[1]

### 1.    The Leeds

Richard was a United States citizen, who died in November 2021. (Dkt. 24-1). Patricia is his widow and an octogenarian. (Dkt. 29-3 at ¶¶ 1, 7). According to Patricia, Richard served in the

---

[1]    Patricia does not raise any objections to the Government's evidence in support of its summary judgment motion except for relevancy objections. (Dkt. 29-1 at ¶¶ 7-15, 25-32). To the extent the Court relies on facts in this decision which Patricia asserts are irrelevant, it overrules those objections. It denies as moot her remaining relevancy objections.

United States Navy for approximately four years from about 1950 until 1954; married Patricia in 1955; and served in the United States Air Force from about 1955 until 1957. (*Id.* at ¶¶ 9-15). Thereafter, Richard worked for Bendix Corporation where he set up satellite communications for "NASA and the military around the world." (*Id.* at ¶ 18). In approximately 1976, Richard began working for Frank E. Basil, Inc. (Basil), an architectural engineering firm providing services under government contracts. (*Id.* at ¶ 20). At Basil, Richard assisted in "securing government contracts to construct military/air-force installations in the Middle East." (*Id.* at ¶ 21). During this time, Richard made "many acquaintances with top military, intelligent [sic] and political figures . . . ." (*Id.* at ¶ 25). He also "began working clandestinely for the Central Intelligence Agency (CIA)," although Patricia attests Richard did not disclose his CIA connections to her "until well after their occurrences." (*Id.* at ¶¶ 26-27).

In November 1984, Richard was traveling by plane to Saudi Arabia on Basil's behalf, when Yemenite terrorists hijacked the plane, which was forced to land in Tehran, Iran. (*Id.* at ¶ 28). Richard was held on the plane for many hours, and then, Iranian authorities questioned him extensively. (*Id.* at ¶ 29). Although Richard was eventually released, the Government did not assist in obtaining his release. (Dkt. 24-21 at p. 2). According to Patricia, this traumatic experience prompted Richard to maintain "a foreign account" to ensure "readily available cash" if he ever needed to pay a ransom in the future. (Dkt. 29-3 at ¶ 31); (*see also* Dkt. 24-21 at p. 2).

### 2.     Richard's EFG Accounts

In fact, Richard maintained two foreign bank accounts with EFG Bank (EFG) in Switzerland for more than three decades. In April 1980—more than four years before the hijacking—an EFG account was opened for Richard's benefit. (Dkt. 24-38 at p. 23). That account is identified by a number ending in 2312 (hereafter "Account One"). (*Id.*). While Patricia disputes

who opened Account One, she does not dispute that Richard controlled and had authority over Account One. (*Compare* Dkt. 24-2 at ¶ 2 *with* Dkt. 29-1 at ¶ 2).

In January 1997, another account was opened at EFG for the Asian Group for International Studies (AGIST).[2] (Dkt. 24-38 at p. 23). This account is identified by a number ending in 0106 (hereafter "Account Two"). (*Id.*). Documents in the record identify Richard as AGIST's director and beneficial owner, who interacted with EFG on AGIST's behalf.[3] (*See, e.g.*, Dkt. 24-27 at p. 10).

Account One was closed in April 2009. (Dkt. 24-38 at p. 23). At that time, Richard had more than $2 million transferred from Account One to Account Two. (Dkt. 24-26 at p. 2; Dkt. 24-30 at p. 27). Then, Account Two was closed in June 2012. (Dkt. 24-38 at p. 23). Richard did not timely disclose either of the Accounts to the IRS, including during the tax years at issue. Patricia denies any personal knowledge of the Accounts until the IRS began investigating Richard in about 2014. (Dkt. 29-3 at ¶¶ 3-4).

### 3.    EFG's Banking Practices

For many years, including the tax years at issue, EFG "conducted a U.S. cross-border banking business that aided and assisted U.S. clients in opening and maintaining undeclared accounts in Switzerland to conceal their assets and income" from the Government. (Dkt. 24-37 at p. 13). To avoid prosecution for assisting its U.S. clients in this manner, EFG entered into a non-prosecution agreement with the U.S. Department of Justice in 2015. (*Id.* at p. 1). In that agreement,

---

[2]    AGIST was apparently established in December 1996, in Turks and Caicos, a British Virgin Island. (Dkt. 29 at p. 22 n.8).

[3]    Patricia contends another individual, Stefan Gerhard Langer, also had access to Account Two. (Dkt. 29-1 at ¶ 3). Even so, that fact does not dispute that Richard admitted being a beneficial owner of Account Two.

EFG identified numerous practices it offered its U.S. clients to allow them to avoid tax obligations in the U.S.

For example, EFG acknowledged that: (1) it "[p]rocessed significant cash withdrawals . . . even though EFG knew, or had reason to know, that some of the accounts contained undeclared assets"; (2) it withheld "statements and other mail" to eliminate a paper trail of the undeclared accounts' existence; (3) it "[o]pened and maintained at least 190 undeclared accounts in the names of sham structures that were beneficially owned by U.S. taxpayers, while knowing or having reason to know that these structures were used by U.S. clients to help conceal their identities from the IRS;" and (4) it "offered code name . . . services . . . allow[ing] the account holder to replace his or her identity with a code name or number on bank statements and other documentation sent to the client" to assist the "U.S. taxpayers in evading their U.S. tax obligations." (Dkt 24-37 at ¶¶ 27-29, 33, 39, 51, 55, 56).

### 4.      Richard's Use of EFG's Banking Practices

Richard utilized these EFG's practices in connection with the Accounts. For example, Richard used pseudonyms[4] to manage the Accounts. Initially, Richard used the pseudonym "Washington" for Account One until July 2006, when he changed the pseudonym to "WashingtonOne." (Dkt. 24-23 at pp. 3-4). Similarly, he used the pseudonym "WashingtonTwo" for Account Two from its inception until it was closed. (*See, e.g.*, Dkt. 24-27 at pp. 3-5). These

---

[4]      Patricia disputes the pseudonyms were "codename[s]" but rather characterizes them as "designation[s]" allowing Richard "to identify himself to EFG in a more secure and efficient manner." (Dkt. 29-1 at ¶ 4). EFG, however, characterizes the service as a "code name" service. (Dkt. 24-37 at ¶ 28). Likewise, Richard explained that "WashingtonOne was a code name." (Dkt. 24-21 at p. 2).

pseudonyms allowed Richard to manage the Accounts by signing WashingtonOne or WashingtonTwo rather than his own name.

Also, both Accounts had "hold mail" instructions, meaning Richard would not receive any documentation about the Accounts other than in person.[5] (*E.g.*, Dkts. 24-24, 24-25, 24-29). Richard explained that he would only be shown account statements when he "visit[ed] in person" and that statements were destroyed after each visit. (Dkt 24-50, questions 6a, 8a). Further, Richard claimed "[i]t was standard practice at the bank that account holders not keep physical records" (*id*., question 8c) and that "[a]ny communication [he] had regarding the account was done in person." (*Id*., question 6a).

Richard also disregarded AGIST's corporate status for purposes of Account Two. Account Two was registered under AGIST, a company over which Richard had control. (Dkt 24-50, question 15e). Richard admitted AGIST was his alter ego. Specifically, he acknowledged that he used AGIST "for the purpose of holding foreign accounts and/or assets without disclosing [his] beneficial ownership"; AGIST "purported to be separate and apart from [him] but, in actuality acted as [his] nominee or alter ego in holding the financial accounts and/or assets"; and "the financial accounts and/or assets held in [AGIST's name] were [his] assets."  (Dkt 24-43 at p. 3).

Finally, the funds for Accounts One and Two are difficult to track. EFG's notes regarding the Accounts state that Richard represented "the origin of the funds . . . was his financial compensation"; at least one of the Accounts "received zero incoming funds since opening"; and Richard only withdrew cash from the Accounts "when in Europe [for] travel/personal expenses."

---

[5]     Although Patricia disputes who placed the hold mail instructions on the Accounts, she does not dispute the instructions existed or offer evidence that someone ordered the instructions. (*See* Dkt 29 at p. 21).

(Dkt. 24-22 at p. 2). Meanwhile, the records show that, over the years, Richard withdrew hundreds of thousands of dollars in cash from the Accounts. (Dkts. 24-30, 24-49).

5.    **EFG's FATCA Compliance**

By October 2011, EFG anticipated complying with the Foreign Account Tax Compliance Act (FATCA), 26 U.S.C. §§ 1471-74, and told Richard that "U.S. clients are not welcome [at EFG] anymore"; "he [would have] to find a solution for his assets"; an IRS form W-9 would be required when FATCA was enforced; and he must "leave asap in 2012." (Dkt. 24-22 at pp. 1, 7). In response, Richard stated he would "see if he [could] get a solution [from his former employer] because they paid him offshore." (*Id*. at p. 1). Then, in February 2012, Richard sent EFG an email stating that "as a result of our discussions in November, management has concluded that all inventory should be converted (except the pre formed metal components, of course) back to cash to be ready for next market activity." (Dkt. 24-34 at p. 1).

The following day, Richard purchased over $1,456,000 in precious metals using Account Two funds. (Dkt. 24-30 at p. 13). About a week later, Richard visited EFG, was "advised of FATCA requirements," and withdrew cash and sold foreign currency from Account Two. (Dkt. 24-22 at p. 3, Dkt. 24-30 at p. 1). Then in June 2012, Richard sent a handwritten note to EFG (signed "Sincerely, WashingtonTwo") directing EFG to close Account Two. (Dkt. 24-31 at p. 2).

6.    **Richard's Failure to File FBARs**

During the tax years in question, Joan Leanos, a certified public accountant, prepared Richard's income tax returns. (Dkt. 24-61, 28:10-32-13); (*see also* Dkt. 24-12; Dkt. 24-14; Dkt. 24-16; Dkt 24-18; Dkt 24-40; Dkt. 24-41; Dkt. 24-42). To prepare these returns, Leanos would send Richard a tax "organizer"; he would complete the organizer, provide supporting

documents, and meet with Leanos; and then, Leanos would prepare the returns. (Dkt. 24-61, 28:10-32-13).

The tax organizers inquired about foreign income and foreign bank accounts for purposes of determining whether an FBAR was required. (*Id*.). Specifically, the organizers inquired whether Richard had foreign income or any interest or signature authority over a financial account in a foreign country. (*See, e.g.*, Dkt. 24-7, questions 17 and 19). Richard consistently answered "no" in writing to each of these questions for the tax years 2010-2012. (*Id*.). Although no organizers have been produced for the tax years 2006 through 2009, Leanos testified that she "most probably" sent organizers for those tax years (Dkt 24-61 at p. 77:3-18) and that Richard had "always" told her there were no foreign accounts. (*Id*. at pp. 79:1-80-18).

Leanos also reported during an interview with the IRS that on one occasion Richard disclosed that a third-party who was "located overseas" owed him money, and Richard inquired whether "he would have to report that money if he brought it to back to the United States"; Leanos stated she told him that "she believed he would and recommended that he speak with a tax attorney who dealt with foreign issues." (Dkt. 24-39 at p. 1); (*see also* Dkt. 24-61, 80:20-93:1). Further, Leanos testified during her deposition in this case that "Richard always said that there were no foreign accounts when I asked him the question and he confirmed that dialog." (Dkt. 24-61, 79:1-80-18); (*see also* Dkt. 24-39 at p. 1) ("Mr. Leeds responded 'no' to the foreign income question every year.").

Based on Richard's representations that he did not have foreign income, Leanos prepared Richard's Form 1040, Schedule B, for every tax year in question, stating Richard had no foreign income. (*Id.*). Specifically, Question 7a on each of these forms inquired whether the taxpayer had "a financial interest in or signature authority over a financial account (such as a bank account,

securities account, or brokerage account) located in a foreign country." For each year in question, Richard signed his tax returns responding that he did not have an interest in a foreign account. (Dkts. 24-12 at p. 4; 24-14 at p. 4; 24-16 at p. 3; 24-18 at p. 6; 24-40 at p. 10; 24-41 at p. 6; 24-42 at p. 6).

###### 7.    Richard's Participation in OVDP

In 2014, EFG contacted Richard to discuss FATCA, to inform him that "all Swiss banks will transmit information to the U.S. for accounts active from 01/01/2008 until today," and to urge him to consider participating in the Offshore Voluntary Disclosure Program [OVDP], which could substantially reduce "the risk of prosecution and penalties." (Dkt. 24-33 at p. 41). In response, Richard asked whether EFG's reporting obligation would "go back to 2008 only," whether AGIST's information would be reported, and whether closed accounts would be reported. (*Id.*).

Sometime in 2014, the IRS began investigating Richard. Thereafter, in December 2014, Richard submitted Offshore Voluntary Disclosure Letters (Form 14454) to apply for participation in the OVDP and was approved for the program. (Dkt. 24-50 at pp. 21-23; Dkt. 24-44 at p. 5). In June 2015, Richard filed FBARs for Accounts One and Two for the tax years 2006 through 2012, and later in October 2016, he filed revised FBARS "to correct errors in account values." (Dkt. 24-44 at p. 5). The revised FBARs reported the maximum account values for each year, which were all over $2 million. (*Id.* at p. 9). The highest aggregate maximum account value was $3,037,768 for Account Two in 2011. (*Id.*).

In October 2016, Richard and Patricia filed amended returns for the tax years 2006 through 2012. (Dkts. 24-13, 24-15, 24-17, 24-19, 24-20, 24-52, 24-53.). The Schedules B on these amended returns answered "yes" to Question 7a and disclosed the Accounts in Switzerland. (*Id.*) Among other changes, the amended returns included "previously omitted foreign interest income,"

**MEMORANDUM DECISION AND ORDER RE MOTION FOR SUMMARY JUDGMENT - 9**

"previously omitted foreign interest dividends," and "previously omitted capital gains." (*Id.*). These amended returns showed annual income significantly greater than the originally declared income.[6]

Ultimately, Richard opted out of the OVDP. (Dkt. 24-44 at p. 5). The IRS commenced an examination and concluded "that willful penalties are warranted for years 2006 through 2012." (*Id.* at p. 4). In September 2020, the IRS assessed willful FBAR penalties against Richard in the total amount of $1,518,883. (Dkt. 24-46); (*see also* Dkt. 24-2 at ¶ 36) (explaining calculation).

After Richard died in November 2021, the Government filed this action against Patricia in August 2022, seeking over $2 million in willful FBAR penalties, late-payment penalties, and interest, among other charges. (Dkt. 1). In its complaint, the Government names Patricia as a defendant in her capacity as a potential successor-in-interest to the Estate of Richard Leeds (Estate), as a personal representative of the Estate, and a potential "distributee" of the Estate. (*Id.* at ¶ 5). Thereafter, the Court ordered that a personal representative for the Estate be appointed "solely for the limited purpose of defending against this litigation." (Dkt. 18 at p. 1); (*see also* Dkt. 29-3 at ¶ 1) (noting Patricia appointed as personal representative solely for purposes of litigation). Following discovery, the Government moved for summary judgment against the Estate. (Dkt. 24 at p. 1).

---

[6]

| Tax year | Original Income | Amended Income |
|----------|-----------------|----------------|
| 2006 | $67,178 | $184,766 |
| 2007 | $55,093 | $168,088 |
| 2008 | $46,745 | $145,312 |
| 2009 | $62,261 | $86,190 |
| 2010 | $45,145 | $71,181 |
| 2011 | $53,003 | $84,212 |
| 2012 | $20,379 | $52,152 |

**LEGAL STANDARD**

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those that may affect the outcome of the case. *See Anderson v. Liberty Lobby*, Inc., 477 U.S. 242, 248 (1986). The trial court's role at summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Zetwick v. Cnty. of Yolo*, 850 F.3d 436, 441 (9th Cir. 2017) (citation omitted). In considering a motion for summary judgment, the court must "view[ ] the facts in the non-moving party's favor." *Id.* To defeat a motion for summary judgment, the respondent need only present evidence upon which "a reasonable juror drawing all inferences in favor of the respondent could return a verdict in the respondent's favor." *Id.* (citation omitted).

Whether a taxpayer has willfully failed to comply with federal reporting requirements to the IRS is a factual question. *Rykoff v. United States*, 40 F.3d 305, 307 (9th Cir. 1994). The Government must prove a failure was willful by a preponderance of the evidence.[7] *United States v. Bohanec*, 263 F. Supp. 3d 881, 889 (C.D. Cal. 2016) (ruling preponderance of evidence is proper burden concerning willful tax penalties); *United States v. McBride*, 908 F. Supp. 2d 1186, 1201 (D. Utah 2012) (ruling preponderance of evidence is burden of proof); *United States v. de Forrest*, 463 F. Supp. 3d 1150, 1156 (D. Nev. 2020) ("The Government bears the burden of proving each

---

[7]    Patricia argues the Government "must prove willfulness by clear and convincing evidence." (Dkt. 29 at p. 14). The caselaw she cites, however, does not support her argument. *See, e.g.*, *Herman & MacLean v. Huddleston*, 459 U.S. 375, 387 (1983) (applying preponderance of evidence standard in securities fraud case); *Bittner v. United States*, 598 U.S. 85, 101-02 (2023) (applying rule of lenity to strictly construe statute against government). Contrary to Patricia's argument, "courts around this country . . . have uniformly held the Government to a preponderance standard in civil FBAR cases." *United States v. Schik*, No. 20-cv-02211 (MKV), 2022 WL 685415, at *3 (S.D.N.Y. 2022) (listing cases). Patricia does not cite any authority to the contrary.

element of its claim for a civil FBAR penalty by a preponderance of the evidence, including the key question here of whether an individual's failure to report was 'willful.'").

"Generally, a determination as to willfulness requires an assessment of a party's state of mind, a factual issue that is not usually susceptible to summary judgment." *JUUL Labs, Inc. v. Chou*, 557 F. Supp. 3d 1041, 1055 (C.D. Cal. 2021). "Nonetheless, when the relevant facts are undisputed, willfulness can be resolved on summary judgment." *Id.*; *see also United States v. Saydam*, No. 22-cv-07371-DMR, 2024 WL 3407677, at * 3 (N.D. Cal. July 12, 2024) (same).

## ANALYSIS

### A.     Richard's Failure to File FBARs Was Willful

Whether the Government properly assessed civil penalties for Richard's failure to disclose the Accounts turns on whether his failure was willful. The Bank Secrecy Act of 1970, 31 U.S.C. §§ 5311-5336 (the Act), requires all U.S. citizens to "keep records and file reports, when the resident, citizen, or person makes a transaction or maintains a relation for any person with a foreign financial agency." 31 U.S.C. § 5314(a). Congress passed the Act in part to require certain reports and records that may be useful in "prevent[ing] . . . money laundering and the financing of terrorism." 31 U.S.C. § 5311(2).

Under the Act's implementing regulations, every "person having a financial interest in, or signature authority over, a bank, securities, or other financial account in a foreign country shall report such relationship to the Commissioner of Internal Revenue for each year in which such relationship exists" and "provide such information . . . in a reporting form prescribed under 31 U.S.C. 5314 to be filed by such persons." 31 C.F.R. § 1010.350(a). The form prescribed is the FBAR. 31 C.F.R. § 1010.350(a). A covered person must file an FBAR by June 30 each year for a foreign account containing at least $10,000 in the prior calendar year. 31 C.F.R. § 1010.306(c).

The IRS has the authority to impose civil penalties on any person who violates the FBAR reporting requirement. The penalty for non-willful violations is $10,000. 31 U.S.C. § 5321(a)(5)(B). A willful violation, however, carries a stiffer penalty: the greater of either $100,000.00 or 50 percent of the account's balance. 31 U.S.C. § 5321(5)(C)(i), (ii).

A person is civilly liable for a willful violation of the FBAR reporting requirement if: (1) he is a United States citizen or lawful permanent resident; (2) he has a financial interest in, or signature or other authority over, a bank, securities, or other financial account in a foreign country; (3) the total balance in the account exceeds $10,000; and (4) he willfully failed to disclose the account. *United States v. Goldsmith*, 541 F. Supp. 3d 1058, 1081 (S.D. Cal. 2021); *United States v. Burga*, 703 F. Supp. 3d 1078, 1085 (N.D. Cal. Nov. 27, 2023); 31 C.F.R. § 1010.350(a).

The parties do not dispute the first three elements, i.e., that Richard was a U.S. citizen; he had authority over the Accounts; and each Account's total balance exceeded $10,000 in the years at issue. Rather, the parties only dispute whether Richard's failure to file FBARs for the Accounts for the tax years 2006 through 2012 was willful. Patricia urges the Court to conclude a genuine issue of material fact exists whether Richard's failure was willful, but the Government argues it was undisputedly willful.

The parties also dispute the applicable standard for determining willfulness—a term the Act does not define and an issue the Ninth Circuit had not addressed before the Government filed its summary judgment motion in this case. Patricia argues that willfulness turns on Richard's subjective intent and that Richard did not likely know about the FBAR reporting requirement. (*See, e.g.*, Dkt. 29 at p. 31). Meanwhile, the Government argues an objective standard applies to determine willfulness. Since the parties filed their summary judgment briefing, however, the Ninth Circuit has definitively resolved the issue of the applicable standard for determining willfulness.

In *United States v. Hughes*, 113 F.4th 1158 (9th Cir. 2024), the Ninth Circuit adopted the standard applied by "every other Court of Appeals to have considered the question" and ruled that "willfulness can be shown by proof of objective recklessness as well as subjective intent." *Id.* at 1160, 1162. In other words, the Ninth Circuit adopted "an objective recklessness standard" for determining whether an FBAR violation was willful. *Id.* at 1160. Under this standard, a determination that a taxpayer willfully failed to file an FBAR requires finding that the filer: (1) clearly should have known there was a grave risk the filing requirement was not being met, and (2) was positioned to very easily find out for certain. *Id.* at 1162 (citing *Bedrosian v. United States of Am., Dep't of the Treasury, Internal Revenue Serv.*, 912 F.3d 144, 153 (3d Cir. 2018)). As the Sixth Circuit has explained, "reckless conduct . . . involves conduct that violates an objective standard: action entailing an unjustifiably high risk of harm that is either known or so obvious that it should have been known." *United States v. Kelly*, 92 F.4th 598, 603 (6th 2024) (internal quotations omitted) (citing *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 68 (2007)).

District courts in the Ninth Circuit applying this objective recklessness standard have ruled that "willful intent may be proven by circumstantial evidence and reasonable inferences drawn from the facts [because] direct proof of the taxpayer's intent is rarely available." *Goldsmith*, 541 F. Supp. 3d at 1084; *de Forrest*, 463 F. Supp. 3d at 1157-58 ("Willfulness can be shown through circumstantial evidence and reasonable inferences drawn from the facts before the court."). Further, "[c]ourts may infer willfulness from (1) 'conduct meant to conceal or mislead sources of income other than financial information' or (2) 'a conscious effort to avoid learning about reporting requirements.'" *Goldsmith*, 541 F. Supp. 3d at 1084 (quoting *United States v. Sturman*, 951 F.2d 1466, 1476 (6th Cir. 1991)); *see also Burga*, 703 F. Supp. 3d at 1091 (Courts have held

that "willfulness may be proven through inference from conduct meant to conceal or mislead sources of income or other financial information.").

The district court's summary judgment decision in *Goldsmith* is instructive in this case. In *Goldsmith*, the court summarized reckless behavior which at least three Circuit Courts of Appeal have found constitute willfulness for purposes of summary judgment:

> The Fourth, Eleventh, and Federal Circuit Court of Appeals have all affirmed a district court's decision to grant summary judgment by finding a taxpayer's failure to report foreign accounts in violation of Section 5314 willful where the taxpayer (1) answered "no" to Question 7a, despite having foreign income while also failing to pursue knowledge of further reporting requirements as suggested on Schedule B; (2) used a numbered account;[8] (3) asked the foreign bank where the foreign account was held to hold all mail related to the foreign account; (4) concealed income or financial information related to the foreign account from his or her tax preparer; and (5) signed federal tax return, which failed to disclose a foreign account, without reviewing it for accuracy.

*Goldsmith*, 541 F. Supp. 3d at 1091 (citing *United States v. Rum*, 995 F.3d 882, 884-86, 889-91 (11th Cir. 2021); *Kimble v. United States*, 991 F.3d 1238, 1241-43 (Fed. Cir. 2021); *United States v. Horowitz*, 978 F.3d 80, 81-82, 90 (4th Cir. 2020). The court in *Goldsmith* found the taxpayer had committed all these acts and that, as a result, he "was charged with constructive knowledge of his FBAR-reporting obligations," which he recklessly disregarded. 541 F. Supp. 3d at 1091, 1092.

Just as in *Goldsmith* (and the Circuit Court cases on which it relies), the record here shows Richard committed the same acts to conceal his Accounts with EFG in Switzerland from the Government. For example, as explained above, Richard's accountant, Leanos, testified that for the tax years 2010 through 2012, Richard completed a tax "organizer" in which he expressly denied having foreign income or any interest or signature authority over a financial account in a foreign country. Although there are no organizers for the tax years 2006 through 2009, Leanos testified

---

[8]     A numbered account means an account maintained in secrecy under a pseudonym. *United States v. Burga*, 703 F. Supp. 3d 1078, 1083 (N.D. Cal. 2023).

that she "most probably" sent organizers for those tax years and, regardless, that Richard had "always" told her there were no foreign accounts. Similarly, Richard denied having any interest in a foreign bank account when signing his tax returns. In each tax year in question, he responded "no" to Question 7a on Form 1040, Schedule B, representing he did not have any interest in a foreign bank account.

Additionally, Richard used the banking practices that EFG offered to conceal the Accounts, as previously discussed. For example, both Accounts had "hold mail" instructions, meaning Richard would not receive any documentation about the Accounts other than in person. Further, while Richard's name was occasionally associated with the Accounts—either directly for Account One or indirectly through AGIST for Account Two—he used pseudonyms for the Accounts, indicating an intent to conceal his identity from being associated with the Accounts. Likewise, Richard maintained Account Two using AGIST, which he admits was an alter ego, in accordance EFG's practice of allowing U.S. clients to use "sham structures" to conceal their identities.

Comparing the original tax returns for the years at issue with the amended returns shows that during most years, Richard maintained more than half his total income in the Accounts. *See United States v. Horowitz*, 978 F.3d 80, 89-90 (4th Cir. 2020) (affirming willfulness where taxpayers knew they were holding significant portion of their savings in foreign bank account). Yet, there is no evidence Richard took any steps to investigate his tax obligations related to this significant sum of money, despite Leanos's advice that Richard should obtain legal advice regarding foreign income.

These facts undisputely show that, even if Richard lacked actual knowledge of the FBAR reporting requirement, he objectively should have known about that requirement; there was a grave risk he was not meeting the requirement; and he was positioned to easily discover the requirement

but apparently declined to do so. *See Hughes*, 113 F.4th at 1163 (setting forth test). Indeed, over the years, he was presented with multiple opportunities to spot the issue. Objectively, Richard's failure to file FBARs was reckless and, therefore, willful. *Id.*

The arguments Patricia offers to the contrary are not persuasive. Many of those arguments focus on Richard's actual knowledge. For example, Patricia argues "genuine disputes remain about whether [Richard] had actual knowledge of the FBAR requirements"; "the government cannot show through *direct* evidence that [Richard] had actual knowledge of his FBAR requirements"; and "[t]he only evidence proffered by the government to prove willfulness is **circumstantial**." (Dkt. 29 at pp. 12, 15-16). These arguments, however, ignore the applicable standard for determining willfulness—namely an objective recklessness standard, which does not require actual knowledge. *See Hughes*, 113 F.4th at 1162 (adopting objectively reckless standard). Further, the arguments ignore that the Government can prove willfulness by circumstantial evidence and reasonable inferences. *See Goldsmith*, 541 F. Supp. 3d at 1084 (noting direct proof is rarely available and circumstantial evidence and reasonable inferences may establish willfulness).

Also, the caselaw on which Patricia relies to assert that the issue of Richard's willfulness presents a triable factual issue is either distinguishable or does not support her position. (*See* Dkt. 29 at 36) (listing cases). For example, the decision in *Burga*, 703 F. Supp. 3d at 1078, supports the conclusion that Richard's failure to file FBARs was undisputedly willful. In *Burga*, the district court ruled that the taxpayer's failure to file FBARs was recklessly willful because he "controlled" the foreign accounts; he "reviewed and signed the tax forms indicating he did not have foreign bank accounts"; he used an "intricate" structure of entities to conceal the accounts; and he was positioned to easily discover the FBAR filing requirement. *Id.* at 1094. Similar facts exist in this case.

**MEMORANDUM DECISION AND ORDER RE MOTION FOR SUMMARY JUDGMENT - 17**

Likewise, the other cases on which Patricia relies to avoid summary judgment are distinguishable. *See, e.g.*, *Schik*, 2022 WL 685415, at *5 (noting taxpayer did not manage accounts, had no formal education, was not asked by his tax preparer about foreign accounts, and relied on tax preparer); *United States v. Cohen*, No. CV 17-1652-MWF, 2019 WL 8231039, at *8 (C.D. Cal. Dec. 16, 2019 (noting factual questions regarding whether wife taxpayer was aware of accounts, signed paperwork regarding accounts, or had access to finances her abusive husband controlled); *United States v. Zwerner*, No. 13-22082-CIV-Altonaga, 2014 WL 11878430, at *3 (S.D. Fla. Apr. 29, 2014) (finding factual questions where taxpayer did not have signatory authority over account, had only indirect interest in account, and did not know he earned foreign income annually); *United States v. Flume*, No. 5:15-CV-73, 2018 WL 4378161, at *9 (S.D. Tex. Aug. 22, 2018) (finding factual questions whether taxpayer tried to hide account and reasonably relied on tax preparer's advice).

In sum, there is no genuine dispute that Richard's failure to file FBARs for the tax years in question was willful under the objective recklessness standard. Based on the undisputed facts, Richard should have known about the FBAR requirements and that there was a grave risk he was not complying with his filing requirements despite being positioned to easily discover his tax obligations. Accordingly, the Government is entitled to the maximum penalties under § 5321(5)(C)(ii) for Richard's willful failure to file FBARs.

**B.    FBAR Penalties Are "Fines" Under the Eighth Amendment's Excessive Fines Clause**

Patricia argues the assessed FBAR penalties violate the Eighth Amendment's Excessive Fines Clause. The Clause provides that "excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. CONST., AMEND. 8; *United States v. Bajakajian*, 524 U.S. 321, 334 (1998). "Two questions are pertinent when determining whether

the Excessive Fines Clause has been violated: (1) Is the statutory provision a fine, *i.e.*, does it impose punishment? and (2) If so, is the fine excessive? [T]he first question determines whether the Eighth Amendment applies; the second determines whether the Eighth Amendment is violated." *Wright v. Riveland*, 219 F.3d 905, 915 (9th Cir. 2000) (citing *Austin v. United States*, 509 U.S. 602, 609-10 (1993)).

Here, the parties' dispute whether FBAR penalties are "fines" within the meaning of the Excessive Fines Clause. The Government argues the Clause is not applicable because the FBAR penalties are remedial not punitive in nature. (Dkt. 32 at pp. 11-12). In support, it relies on *United States v. Toth*, 33 F.4th 1 (1st Cir. 2022). In that case, the First Circuit Court of Appeals reasoned that the Clause only applies to monetary penalties which function as a punishment for a criminal offense. *Id.* at 15-16 (discussing *Austin*, 509 U.S. at 619-20 (imposing civil forfeiture following criminal conviction for drug-trafficking) and *Bajakajian*, 524 U.S. at 328 (imposing forfeiture after criminal proceeding)). Further, the First Circuit explained that "a tax penalty for failing to file taxes can exceed the amount owed in taxes without . . . constituting a punishment." *Toth*, 33 F.4th at 18 (relying on *Helvering v. Mitchell*, 303 U.S. 391, 401 (1938), and *McNichols v. Comm'r of Internal Revenue*, 13 F.3d 432, 434-36 (1st Cir. 1993)). Based on this reasoning, the First Circuit held a civil FBAR penalty is not a fine under the Clause. *Toth*, 33 F.4th at 19.

Recently, however, the Eleventh Circuit Court of Appeals reached the opposite conclusion in *United States v. Schwarzbaum*, 127 F.4th 259 (11th Cir. 2025). In that case, the Eleventh Circuit held that "FBAR penalties are in substantial measure punitive in nature" and thus "subject to review under the Eighth Amendment's Excessive Fines Clause." *Id.* at 265. The Eleventh Circuit focused on the "critical question" of whether the penalty is designed to punish the offender. *Id.* at

271. In considering this question, the Court noted "the purpose of the FBAR penalty is—at least in part—punishment." *Id.*

In support, the Eleventh Circuit explained that "the text of the statute mandates that the penalty is calculated 'irrespective of the magnitude of the financial injury to the United States, if any"; "the severity of penalty is tied directly to culpability" and "bears no relationship to the government's costs"; "the maximum FBAR penalty is among the harshest civil penalties the government may impose"; and Congressional history indicates "the very design and purpose of the FBAR penalties is to deter." *Id.* at 271-72 (quotation marks and brackets omitted). Based on these reasons, the Eleventh Circuit concluded "the FBAR penalty has a powerful punitive purpose" and "is a fine subject to the Eighth Amendment's Excessive Fines Clause." *Id.* at 274. In reaching this conclusion, the Eleventh Circuit criticized *Toth* for "fail[ing] to circumnavigate the problem that even if the FBAR penalty has some remedial purpose, the test in the Excessive Fines context remains whether the purpose of the penalty is *solely* compensatory." *Id.* at 275.

Here, the Court concludes the Eleventh Circuit's decision in *Schwarzbaum* is persuasive and more well-reasoned than *Toth*. Moreover, the Court notes that when the Ninth Circuit was presented with the opportunity in *United States v. Bussell*, 699 Fed. App'x 695 (9th Cir. 2017), to decide whether the Excessive Fines Clause applies to willful FBAR penalties, it assumed the Clause applies. *Id.* at 696 (9th Cir. 2017) (implicitly assuming without analysis that the Excessive Fines Clause applies to FBAR penalty). At least one district court in the Ninth Circuit has relied on *Bussell* to likewise assume the Clause applies to an FBAR Penalty. *See United States v. Kerr*, No. CV-19-05432-PHX-DJH, 2022 WL 912563, at *9 (D. Ariz. Mar. 29, 2022). Further, the Ninth Circuit has applied the Clause to civil penalties imposed by law in other contexts. *See Pimentel v. City of Los Angeles*, 974 F.3d 917, 922 (9th Cir. 2022) (applying Clause to municipal parking cases

and citing *Vasudeva v. United States*, 214 F.3d 1155, 1161-62 (9th Cir. 2000) (applying Clause to civil monetary penalties for trafficking federal food stamps), and *Balice v. U.S. Dep't of Agriculture*, 203 F.3d 684, 698-99 (9th Cir. 2000) (applying Clause to civil fines levied under Agriculture Marketing Agreement Act). Accordingly, like the Ninth Circuit in *Bussell*, this Court assumes the Excessive Fines Clause applies to FBAR penalties.

**C.    The FBAR Penalties Are Grossly Disproportionate as to Patricia but not to Richard**

Accordingly, the Court must assess whether the penalties are excessive. The Supreme Court established the standard for evaluating challenges to a fine under the Clause in *Bajakajian*, 524 U.S. at 334. Under the *Bajakajian* standard, a fine violates the Clause if it is "grossly disproportional" to the gravity of the offense. The factors a court considers in determining disproportionality include: (1) the nature of the conduct, (2) the resulting harm, and (3) whether other penalties may be imposed. *Id.* at 336-38; *see also Kerr*, 2022 WL 912563, at *9 (noting factors); *United States v. Bussell*, No. CV 15-02034 SJO, 2015 WL 9957826, at *7 (noting factors). *Bajakajian*, however, does not mandate the consideration of any rigid set of factors to determine whether a fine is grossly disproportional to the gravity of the offense. *United States v. Mackby*, 339 F.3d 1013, 1016 (9th Cir. 2003). Further, "[c]ourts show substantial deference to legislative bodies when reviewing statutorily established penalties." *Kerr*, 2022 WL 912563, at *9. The assessed party bears the burden of showing the FBAR penalties are grossly disproportional. *See United States v. $132,245.00 in U.S. Currency*, 764 F.3d 1055, 1058 (9th Cir. 2014).

**1.    Patricia's Culpability**

Patricia argues the FBAR penalties are grossly disproportionate as to her. (Dkt. 29 at p. 42). Patricia is correct that, to the extent the Government seeks to recover the penalties against her property, the Court must analyze whether those penalties are grossly disproportional to her

conduct. The Ninth Circuit held in *United States v. Ferro*, 681 F.3d 1105, 1107 (9th Cir. 2012), that an excessiveness review under the Excessive Fines Clause must consider the individualized culpability of the owner of the property subject to the fine. In *Ferro*, Ferro was convicted of unlawfully possessing firearms valued at $2.55 million, which his wife owned. *Id.* at 1108. The Government initiated a civil action to forfeit the firearms. *Id.* at 1108. Despite the wife's ownership, she did not know the guns were hidden in her house or how many there were. *Id.* In analyzing whether the forfeiture was excessive, the district court "did not consider [the wife's] culpability even though the punishment was actually levied on her." *Id.* at 1115. The Ninth Circuit ruled that the district court "misapplied the inquiry" and that "proper focus of the excessiveness inquiry" is on "the person who is actually punished by the 'fine.'" *Id.* at 1116 (citing *von Hofe v. United States*, 492 F.3d 175, 178-79 (2d Cir. 2007)).

   The Government summarily dismisses Patricia's argument that the FBAR penalties are grossly disproportional as to her. It asserts this argument is "misdirected" because "this action is not against [Patricia] personally" but rather that it is only against Richard's Estate. (Dkt. 32 at p. 13). Nonetheless, the Government's allegations are less than clear how it intends to recover the FBAR penalties and that it does not intend to recover the FBAR assessments against Patricia personally. For example, the complaint's caption identifies Patricia in her individual capacity not just as the Estate's personal representative, and it alleges she is named as a defendant in her capacity as "a potential successor-in-interest" and as a "distributee" of the Estate—not just as a personal representative. (Dkt. 1 at ¶ 5) (emphasis added). These allegations at least suggest the Government may seek to levy the FBAR penalties against property that Patricia owns and Patricia's opposition to the summary judgment motion indicates she is concerned about that possibility.

Further, the Government's allegations indicate a lack of clarity on the status, if any, of Richard's Estate. Specifically, the Government alleges that "it is currently unknown whether [Richard] died testate [and] whether the Estate is in probate. No probate estate appears to have been opened in Idaho, Maryland, or Lake County, Florida." (*Id.* at ¶ 6). Apparently, the parties did not attain any clarity on these issues during discovery. For example, the Government states in its summary judgment briefing that its "searches located no probate cases that had been opened for the Estate." (Dkt. 24-1 at p. 7).

Based on this record, how the Government intends to recover the FBAR penalties is unclear. The Government is apparently unaware of the exact property against which it intends to recover the penalties. Conceivably, the Government may attempt to recover the assessed penalties against property in which Patricia has an ownership interest, for example under Idaho community property laws. For these reasons, the Court addresses Patricia's conduct for purposes of determining whether the penalties are grossly disproportional as to her.

Patricia argues the penalties are grossly disproportional as to her because she "had no knowledge of the [Accounts]" and " did not have any interest or signatory rights in the Accounts." (Dkt. 29 at p. 42). In support, Patricia attests that she "was completely unaware" Richard had the Accounts until the Government commenced its investigation concerning the Accounts. (Dkt. 29-3 at ¶¶ 3-4). The Government does not refute that Patricia had no knowledge of the Accounts.

Further, Patricia has submitted an expert report of an accountant who evaluated the economic impact of the penalties on her. (Dkt. 29-12). He opined that the penalties "would pose a significant negative impact on [her] financial wherewithal" and "on [her] cash flow needed to support [her] living expenses" and that she "would be [financially] unable to recover" from the penalties. (*Id.* at pp. 3-4, 6).

The Government's only response to this expert report is to assert it is "inadmissible hearsay and should not be considered" on summary judgment. (Dkt. 32 at p. 13 n.11). In support of this argument, the Government relies on *Hunt v. City of Portland*, 599 Fed. App'x 620 (9th Cir. 2013). In that case, the Ninth Circuit ruled that an expert's written report "is hearsay to which no hearsay exception applies" and that the district court erred by admitting the report in evidence at trial. *Id.* at 621. Although the Government is correct that an expert report is inadmissible hearsay for purposes of trial, the admissibility determination for summary judgment purposes is different.

Under Rule 56(c)(2)of the Federal Rules of Civil Procedure, the Court considers the evidence's contents rather than its form. *Fraser v. Goodale*, 342 F.3d 1032, 1036-37 (9th Cir. 2003). If the evidence's contents could be presented in an admissible form at trial, then the contents may be considered on summary judgment. *Id.*; Fed. R. Civ. P. 56(c)(2) (providing party "may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence"). Here, the expert could present the report's contents through his testimony at trial. Accordingly, the Court may consider the report for purposes of summary judgment. *See Jeffers v. Farm Bureau Prop. & Cas. Ins. Co.*, No. 2:12-CV-02444 JWS, 2014 WL 4259485, at *3 (D. Ariz. Aug. 28, 2014) (overruling objection to expert report as hearsay on summary judgment).

Based on this record, the Court finds the FBAR penalties are grossly disproportional to Patricia's culpability in the conduct giving rise to those penalties. The undisputed facts are that Patricia had no access to Accounts and no knowledge about them until the IRS began its investigation into Richard after he had closed the Accounts. Because the assessed penalties are grossly disproportional to Patricia's conduct, the Government may not recover them against Patricia personally or against her property.

### 2.    Richard's Culpability

Patricia also asserts the FBAR penalties are "grossly disproportional towards [Richard]." (Dkt. 29 at p. 44). In support, she argues that he was not "an intentional tax cheat"; he "has already paid the taxes that were due on the income"; his failure to file timely FBARs "was not connected to any illegal activities"; and the Government's damage "if any" is only its "lack of [Richard's] foreign bank *information* in real time." (*Id.* at pp. 44-45).

These arguments, however, ignore Richard's willful conduct which, as noted above, include that Richard failed to disclose the Accounts for decades; affirmatively represented he did not have any foreign accounts on multiple occasions; apparently ignored his accountant's recommendation to seek legal advice regarding his foreign holdings; used a sham corporate structure for years to evade his tax obligations; and for at least the tax years in question, maintained more than half his total income in the Accounts. Based on this record, Patricia has failed to meet the burden of showing the FBAR penalties are grossly disproportional as to Richard. *See Bussell*, 699 Fed. App'x at 696 (holding FBAR assessment was not grossly disproportional to harm where defendant defrauded government and reduced public revenues).

### D.    The FBAR Penalties Survived Richard's Death

Patricia argues that the FBAR penalties "extinguished" when Richard died. (Dkt. 29 at p. 45). Whether the penalties abated upon Richard's death "depends on whether the underlying statute is penal or civil in nature," which is an issue of statutory construction. *Reiserer v. United States*, 479 F.3d 1160, 1162-63 (9th Cir. 2007). The Supreme Court in *Hudson v. United States*, 522 U.S. 93, 99-100 (1997), identified the following factors for consideration in determining whether a statute is penal or civil:

> (1) whether the sanction involves an affirmative disability or restraint; (2) whether it has historically been regarded as a punishment; (3) whether it comes into play

only on a finding of *scienter*; (4) whether its operation will promote the traditional aims of punishment-retribution and deterrence; (5) whether the behavior to which it applies is already a crime; (6) whether an alternative purpose to which it may rationally be connected is assignable for it; and (7) whether it appears excessive in relation to the alternative purpose assigned.

Patricia argues an analysis of these factors requires the conclusion that FBAR penalties are punitive in nature and did not survive Richard's death. (Dkt. 29 at pp. 45-59). As the Government notes, however, every court applying these factors to determine whether FBAR penalties survived the taxpayer's death has concluded the penalties are remedial for purposes of survival. *See, e.g.*, *United States v. Wolin*, 489 F. Supp. 3d 21, 27 (E.D.N.Y. 2020); *United States v. Green*, 457 F. Supp. 3d 1262, 1272 (S.D. Fla. 2020); *United States v. Estate of Schoenfeld*, 344 F. Supp. 3d 1354, 1375-76 (M.D. Fla. 2018); *United States v. Park*, 389 F. Supp. 3d 561, 575 (N.D. Ill. 2019). This Court, likewise, reaches this same conclusion that the FBAR penalties survived Richard's death.[9]

## CONCLUSION

In summary, the Court concludes that the FBAR penalties, which are both remedial and punitive, survived Richard's death. The undisputed facts show Richard willfully failed to file FBARs under the objective recklessness standard. Assuming the Eighth Amendment Excessive Fines Clause applies to FBAR penalties, those penalties are grossly disproportional as to Patricia who had no access to or knowledge of the Accounts but not as to Richard. Patricia has failed to meet her burden of proof that the penalties are grossly disproportional to Richard's culpability.

---

[9]    This conclusion is not inconsistent with the conclusion that the Excessive Fines Clause applies to the penalties because "the test in the Excessive Fines context remains whether the purpose of the penalty is *solely* compensatory." *United States v. Schwarzbaum*, 127 F.4th 259, 275 (11th Cir. 2025); *see also United States v. Green*, 457 F. Supp. 3d 1262, 1272 (S.D. Fla. 2020)("[T]he FBAR penalty is the proverbial square peg in the round hole; it fits perfectly in neither of the round holes of the remedial-penal dichotomy. Rather, the FBAR penalty is primarily remedial with incidental penal effects.").

Accordingly, the Government is entitled to summary judgment against the Estate. The Government, however, may not recover the assessed penalties against Patricia individually.

## ORDER

IT IS ORDERED that:

1.      Plaintiff's Motion for Summary Judgment (Dkt. 24) is **GRANTED** as against the Estate of Richard Leeds.

2.      The Court will enter a judgment against the Estate in accordance with an amount to be determined upon proof. The Government is ordered to provide an updated calculation of interest and costs within twenty-eight (28) days of this Order's entry.

DATED: March 07, 2025

Amanda K. Brailsford
U.S. District Court Judge